## KENNEDY ET AL. *vs.* MARRAST ET AL.

[BILL IN EQUITY TO SET ASIDE CONVEYANCE ON GROUND OF MENTAL INCAPA-
CITY, INADEQUACY OF CONSIDERATION, AND FRAUD.]

1. *Deed by one of non-sane mind void.*—A deed made by a party of *non-sane* mind, to such a degree as to incapacitate him for making contracts, is void, and his heirs may file a bill in chancery to set it aside.

2. *Decree of chancellor, when will not be reversed; preponderance of evidence.*—When the decree of the chancellor is not opposed to the evidence on which it is based, it will not be reversed because the evidence which supports it is weak and suspicious. Before such a decree is disturbed, there must be a strong preponderance of the evidence against it.

APPEAL from Chancery Court of Mobile.
Heard before Hon. A. C. FELDER.

THE appellees, minors, filed in May, 1867, by next friend, a bill in equity against appellant, John P. Kennedy, seeking to set aside the conveyance to said Kennedy of a house and lot in Mobile, made by their father, J. C. Marrast, deceased, on the 30th November, 1863. One Strange, who was in possession of the property at the date of the filing of the bill, under a lease from Kennedy, and Harriet E. Marrast, widow of J. C. Marrast and his administratrix, in her individual capacity and as administratrix of said Marrast, were made parties defendant, the bill alleging, as to her, that she claimed dower in said house and lot, &c.

The bill alleges that " at the time of making said sale and deed, Marrast was in his last sickness, was a paralytic and did not possess a sane mind; that at that time his mind was so destroyed that he had not capacity to contract; that his condition was such that any person proposing to deal with him was bound to take notice of the fact, or be put upon enquiry as to the state of his intellect," &c. The bill also alleged fraud and inadequacy of consideration, and prays that the deed, &c., be declared void; that the title to said property be divested out of respondents and invested in complainants; that respondents be decreed to account for the rents and profits, &c., and offers to pay respondent Kennedy the value of the Confederate money paid by him, with interest.

Appellant answered, denying the allegations of mental incapacity, fraud, inadequacy of consideration, pleads that he is a *bona fide* purchaser for a full and valuable consideration, and demurred to the bill for want of equity.

The defendant Strange, in his answer, admitted indebtedness to Kennedy for rent of the premises, and offered to pay the same to those legally entitled to receive it. A decree *pro confesso* was taken as to Harriet Marrast.

The record is quite voluminous, and the details of facts connected with the sanity and mental capacity of Marrast are quite lengthy and minute; but in the view taken of the case by the court it is only necessary, for a proper understanding of the opinion, to make a brief abstract of the testimony of the parties.

By the appellees, it was proved that their father, John C. Marrast, died on December 14th, 1863, of paralysis, from which he had been suffering for many months; that on the 30th of November, 1863, said Marrast and wife executed a deed for the house and lot to Kennedy, in consideration of the payment of $17,000 Confederate money, which then was worth in market seventeen dollars in Confederate notes for one dollar in gold.

There was proof tending to show the utter physical and mental incapacity of Marrast several months prior, and continuously up to his death; that he was not capable of

contracting, and in such a state of mind that his wife feared fatal results to him if she refused to sign the deed and thereby break off the sale. There was evidence tending to show that the house and lot in 1863 was worth $12,000 in United States currency, and that the price paid for it was grossly inadequate, &c.

On behalf of appellant, there was much testimony on the part of several practicing physicians and others, tending to show, that the mind of Marrast gave no evidence of insanity or unsoundness up to the very hour of his death. It was proved that all the negotiations for the sale, &c., were made with one Evans, as agent of Marrast; that Evans had been offering the house and lot for sale for several months, and that Marrast and wife signed the deed, and no dissatisfaction with the sale by any one was ever expressed to Kennedy until the filing of the bill. Kennedy testifies, that he knew nothing whatever of the unsoundness of Marrast's mind, and there is no proof that he did. Appellant also offered much testimony going to show that the price paid for the house and lot was, for the times and condition of the country, a high price, &c.

On the hearing, the chancellor decreed that the deed to Kennedy be rescinded and annulled; that the title to said property be divested out of respondent and invested in complainants; that respondent account for the rents and profits from the date of the purchase, and that respondent be reimbursed the value in lawful money of the Confederate money at the time it was paid, with interest, &c. A reference was ordered to the register to take and state an account, &c., and upon the coming in of the report, the chancellor confirmed the same.

Kennedy appeals, and now assigns as error the decree of the chancellor on the hearing.

DARGAN & TAYLOR, for appellant, commented at length upon the evidence, contending that it did not sustain the decree, and presented the following argument on the law of the case:

1. The court will bear in mind that this was a completely

*executed* contract. Kennedy received the house, and Marrast the purchase-money; and, also, that the contract is voidable only, and not void.—See 2 Kent Com., 7th ed., p. 562; 12 Barb. 237, and cases cited. Consequently, when it is sought to be set aside, the court requires the complainants to put the defendant in *statu quo*, and in all cases to do equity where the defendant is an innocent party.—Wharton & Steele, M. J., p. 15. Now, we insist that Mr. Marrast, if living, could not rescind the sale and recover the house without accounting for the use of the money. Suppose he invested it in cotton, and made large profits by the sale; bought other valuable property, or used it in the taking up of old gold debts, dollar for dollar, or in any other profitable manner, could he keep to himself all those profits or benefits arising from the use of our money, and then rescind the sale and take the house to boot? If he could not, his children, who occupy his shoes, can not. The court is ready to make them *whole,* but will not aid them to *speculate;* nor will the court take the risk of being imposed upon, by their refusing to account for the use made of the money. The complainants demand the house, and all the rents and profits made by us since it has been in our hands. Now, we ask the same of them as to the purchase-money. They have failed utterly. Their simple reply to this plea is, Never mind what we did with the money, or how much we have made; this is none of your business; we will pay you upon the then value of the money—that is, one dollar for sixteen in gold, and no more. This is no answer or defense to our plea.

2. The rule in equity is, that the court will not set aside the sale, unless the defendant can be placed in *statu quo.* In this case, the defendant can not be placed where he was. The money, and the government that made it, were dead before they made the offer to rescind. All the uses and purposes to which it could have been put, are gone, with the extraordinary times which gave it existence, never to return. The complainants, or their father, took to themselves the money, and assumed all the chances of in-

vestment and speculation, and of which we have been deprived forever, and put upon us all the risks of the war. Defendant's intention to invest and not risk the money, is manifest by his act in this purchase. Had he not made this, would have made others, which he could have done anywhere in this city at the same or better rates; or he could have done otherwise; all of which he has been deprived of. To say you will value his then money for him, with gold as the standard, is not meeting the equitable rule; his right to exercise his own judgment was taken from him, until all chances are gone; besides, why take *gold* as the standard? There is clearly no equity in this. We prove that gold was not used as money, but was bought and sold like other articles. Gold was higher than any other article. Take corn, bacon, cotton, and real estate, and we could have bought them at two or three for one; and yet *gold* is forced on us at *sixteen* for one. Why is this? We did not want *gold* at that price; besides, you take Confederate money and reduce it to gold, and give it to them *then*, and return us the same amount *now*, when it was then worth two or three times more than it now is. With one dollar then, we could have bought two or three times as much as now. Even at the North, about the same time, it was worth as high as $2.80 in greenbacks, for one. The fact is, we can never be placed in *statu quo.* " True and generous equity" can not now be done.—1 Story Eq, § 228; 1 Pars. on Cont. 312; Wharton & Stelle, p. 15, § 11; *ib.* p. 7, note B; 2 Paige, 158; 7 S. & M. 103.

3. Mr. Marrast first placed the house in the possession of Mr. Evans, some two or three months before the sale was made. It will hardly be contended that he was incompetent when he gave this power of sale. No notice of subsequent insanity was ever given to the agent or purchaser. The authority was never revoked, but was consummated into a legal title. It is said by good authority, that "where authority is given by a *sane* man, who subsequently becomes *insane,* and without knowledge a sale is made to an innocent purchaser, it shall stand good."— 2 Kent Com. 645, side page; 1 Pars. on Cont. 61, note E;

Story on Agency, p. 501, note 3 ; 1 Bell Com. 4th ed., p. 395, § 413; 10 N. H. 156.  Whether the power to Evans was in writing or not, can not affect the case, for if the insanity revokes the power at all, it would do so whether it were in writing or in parol.  The rule is based on a principle of equity, not the statute of frauds, and grows out of the following well settled equity doctrine, that " when one of two innocent persons must suffer, equity will put it upon him whose acts and conduct furnished the opportunity and induced the result."  Mr. Marrast having in this case, when he was rational and sober, armed Mr. Evans with authority to seek and find a purchaser, and make the contract of sale, if Mr. Evans' action, under his power, has caused injury, who must suffer—the innocent purchaser, or he whose action induced the evil ?  If Mr. Marrast set the deadfall, can his representatives complain if it fell on himself?—See Story on Sales, 161, § 202 ; 25 Barb. 484, top page ; 37 Barb. 509 ; 37 N. Y. Rep. 509 ; Smith's Merch. Law, 288-9.

It is also a well settled principle in equity, that " where the equities are equal, the law must prevail."  In this case, both plaintiff and defendant claim under J. C. Marrast. Mr. Kennedy, a purchaser for value, and complainants, by descent only ; otherwise, they may be said to be equally innocent and equally diligent.—See Story's Eq., vol. 1, § 57.

The following cases show the rule to be, that the court will not grant relief against an innocent person, especially where he can not be placed in *statu quo*.  In many cases *statu quo* is not mentioned, where the purchaser is innocent, and objects.  And in all cases where the subject is *destroyed*, it is held the parties could not be put in *statu quo*.  There is no such thing as *valuing the loss* and making him whole with money.  The parties must be placed back exactly as they were, or not at all.  Can the Confederate money paid be now returned as it was, with all the opportunities to use it that *then* existed ?—9 Vez. 478, 482 ; 9 Wills, H. & G. 309 ; 24 Eng. L. & Eq. 486 ; 26 *ib.* 540 ; 7 *ib.* 284 ; 1 McCarter, (N. J.) 389 ; 13 Iredell, 106 ; 32 Vt. 652 ; 28 Conn. 127 ; 18 Ill. 282 ; 8 Rich. E. 286.

Taking these things altogether, the decision of the chancellor should be reversed, and the case dismissed.

HERNDON & SMITH, *contra.*

PETERS, J.—The deed under which the appellant, Kennedy, seeks to support his title, was made by Marrast himself, and not by his agent. And Kennedy must be charged with notice, just as if he dealt directly with Marrast himself. If Marrast was of *non-sane* mind to such a degree as to incapacitate him from making such a contract when the deed was signed by him, and he did not afterward affirm it when he was of sound mind, it was void. A legal capacity to consent is the essence of all contracts, whether by deed or parol. Without this they are absolutely void. 1 Story Eq. §§ 222, 223, 227, 228, 229, 230 ; 1 Pars. Cont. 383, *et seq.;* 5 Bac. Abr. (Bouv.) 5, 26 ; 2 Poth. Obl. by Evans, note III, p. 22, *et seq.; Rawdon v. Rawdon,* 28 Ala. 565. A bill to set aside such a deed may be filed by the heirs of the maker.—Newland Cont. p. 19, note C.

The capacity of John C. Marrast, deceased, the ancestor of the complainants in the court below, is the question put in issue by the pleading. This is a fact, and not a question of law. This fact was submitted upon the proofs taken in the cause to the decision of the chancellor. His decision was favorable to the complainants and against the capacity of Marrast to make the deed. In such a case the decision of the chancellor will not be disturbed, unless there is a decided preponderance of the evidence against the conclusion attained by him.—*Phillips, adm'r, v. Phillips,* 39 Ala. 63. I think the testimony in this case sufficiently sustains the decree. It will therefore be left to stand.

The decree of the chancellor is therefore affirmed, and said John P. Kennedy, appellant, will pay the costs of this appeal in this court and in the court below.

[NOTE BY REPORTER.—At a subsequent day of the term,

appellant applied for a re-hearing, and filed in support thereof the following argument :]

The rule of law is well settled, and has been stated with clearness by Peck, C. J., in the case of *Cotton v. Ulmer*, as follows : " Reason is the common gift of God to man ; hence *every man* is presumed to be sane, and insanity can only be proved by clear and *unexceptional evidence.*"

Partial insanity will, however, invalidate a will or a contract, but it must be fully and clearly established that the act was the result of such partial insanity ; for to hold that testimony of a doubtful or suspicious character, even as to partial insanity, would defeat a solemn act, would in truth and in legal effect be to annul the proposition that insanity, to invalidate a deed or will, must be clearly established.

The question, therefore, is not whether the testimony in this case renders it doubtful whether Marrast was *compos mentis* at the time of executing this deed ; but it is, whether the evidence clearly establishes his mental incapacity. And we insist that this is a rule of law that is binding on the court. The burthen is on the complainants to overcome the *deed*. It is assailed on the ground of mental incapacity *alone*, for neither fraud or undue influence is pretended ; and before it can be annulled, " the proof must be *clear and unexceptionable ;*" that is, the mind of the court must be satisfied of incapacity, for we must be guided by the rule laid down in *Cotton v. Ulmer*, which only announces a rule that has been recognized for ages.

It may be true, as stated in the opinion delivered, that in cases of doubt this court will not reverse the decision of the chancellor on a mere question of fact ; yet we ought to look at the case in 39 Ala. 63, *Phillips v. Phillips.*

In that case, the bill was filed to impeach a deed. The testimony rendered the question of capacity doubtful. The bill was dismissed, and the decree was affirmed in this court, in harmony with the general principle just adverted to, and announced by the Chief Justice in *Cotton v. Ulmer*. And if the court, in 39 Ala. 63, had put the decision on

this ground, its reasoning would have been as cogent as its judgment or decree was correct. But to say that if a chancellor, upon doubtful testimony, sets aside a deed for want of mental capacity, this court will not reverse, is to say that if the chancellor disregards a cardinal rule of law, this court will not examine it, because he committed the error in looking to the evidence, or the weight of evidence. To such a proposition this court will not commit itself.

It may be added, that the language in 39 Ala., used by the court, is apt to mislead, and in the case at bar may have misled this court; for the well-considered rule is laid down in the celebrated case of *Kennedy v. Kennedy*, 2 Ala., in which Collier, C. J., says : " We will not undertake to say that the appellate court will not reverse a decree on the ground that an issue was not directed to be tried by a jury, when it appears that the facts are so disputed as to render it impossible to explicate them, even although no issue was prayed in the court below. In such a case, a *viva voce* examination before a jury seems indispensable."

Now, if there ever was a case where an issue should be directed, it is this ; for no human mind can read all the depositions and say, ".I have no doubt but Marrast was mentally incapable of making a contract of this character." He must say, indeed all must say, that *at the least* the question of his mental capacity is doubtful.

The whole proof thus answered, the rule seems to apply the deed must prevail, and the bill be dismissed.

If, however, the mental capacity be so involved in doubt that the court should be unwilling to dismiss the bill, then the issue should be directed, as stated in 2 Ala.

The following response to the petition was made by—

PETERS, J.—The evidence in this case was carefully examined in the preparation of the opinion in the first instance. I have again examined it in connection with the authorities furnished by the eminent counsel in support of the application for a re-hearing, and I do not feel that the testimony did not justify the decree of the learned chan-

12

cellor in the court below. It is true that in the court be-
low the presumption is in favor of the sanity of the maker
of a deed. But when the case comes here, the presump-
tion is the other way. It is in favor of the correctness of
the chancellor's decree, the verdict of the jury, or the de-
cision of the judge below upon the facts, unless there is a
strong preponderance of the evidence against the judg-
ment below.—*Phillips v. Phillips, adm'r,* 39 Ala. 63.

The re-hearing is therefore denied, with costs.